UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:22-cr-00058-MMD-CSD-1 |
| Plaintiff, | ORDER |
| v. | |
| ADREAL WADLEY, | |
| Defendant. | |

## I.    SUMMARY

Defendant Adreal Wadley was indicted on a single count of felon in possession of a firearm. (ECF No. 1.) Wadley now moves to suppress the evidence the government has collected against him.[1] (ECF No. 41 ("Motion").) He argues that his Fourth Amendment rights were violated in multiple ways warranting suppression when Sparks Police Department ("SPD") Detectives Canterbury and Radley seized him and ultimately searched his car outside the Nugget Casino in Sparks, Nevada. (*Id.*) The Court held an evidentiary hearing on the Motion during which Detectives Canterbury and Radley testified. (ECF No. 59 ("Hearing").) As further explained below, the Court agrees with the government that SPD officers had reasonable suspicion to seize Wadley and that the seizure constituted an investigatory stop rather than an arrest. The Court further finds that even if the officers lacked reasonable suspicion for the seizure, evidence from Wadley's car is admissible under the attenuation and inevitable discovery doctrines because the officers identified a valid warrant for Wadley's arrest during their investigation.

---

[1]The government filed a response (ECF No. 48), and Defendant filed a reply (ECF No. 50). The Court issued a minute order denying the Motion (ECF No. 60), and now issues this written order to explain its reasoning.

1

**II.     FINDINGS OF FACT[2]**

2          The Court relies on the evidence admitted at the Hearing—including video
3  recordings of relevant body camera and security camera footage—along with Detective
4  Canterbury and Detective Radley's testimony at the Hearing, to construct this factual
5  background.[3] The Court also notes that it only makes factual findings pertinent to the legal
6  discussion that follows.

7          **A.     SPD Patrol**

8          Detective Canterbury testified that he is employed as a detective for the SPD
9  Regional Crime Suppression Unit. He has worked at SPD for four years. In June 2022, at
10 the time of his encounter with Wadley, Detective Canterbury was on assignment as an
11 SPD patrol officer. In this role, he was familiar with the streets surrounding the Nugget
12 Casino.

13         During the afternoon of June 20, 2022, while patrolling solo in a marked SUV,
14 Detective Canterbury received a call through dispatch with information about a robbery
15 that had occurred shortly before 4:00 p.m. at the RTC Transit Center. (Government's Exh.
16 5 at 2.) The RTC Transit Center is a bus station located within roughly half a mile of the
17 Nugget, to the west of the casino. The bus station is identified as "RTC Centennial Plaza
18 Station," directly south of Victorian Avenue, on a google map image of the area admitted
19 at the Hearing.

20 ///
21 ///
22 ///

23
24

25         [2]*See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a
   motion, the court must state its essential findings on the record.").
26

27         [3]References to Exhibits ("Exh(s).") herein are to exhibits the Court admitted at the
   Hearing. All other references are to particular CM/ECF filings. The Court refers to
28 testimony at the Hearing by simply describing it as such.



(Government's Exh. 1.) Per the information Detective Canterbury received through dispatch, the robbery suspect was a Black man in his late twenties with a red shirt, blue jeans, and "afro-style" hair. (Government's Exh. 5.) The weapon used in the robbery was a black semi-automatic rifle. Detective Canterbury also learned the suspect was last seen traveling eastbound from the bus station, towards the Nugget. The suspect left on foot, and Detective Canterbury testified that he received no information indicating that any car was involved.

After receiving this report, Detective Canterbury responded in the vicinity of the Nugget, where he began looking for individuals who matched the reported description of the robbery suspect. As part of his canvass, he looked inside vehicles as he drove.

While driving slowly on Victorian Plaza Circle along the east side of the Nugget, Detective Canterbury passed a blue Toyota sedan with a California license plate, stopped on the curb of the street close to a marked entrance to the casino. (Government's Exh. 14.) Casino surveillance footage shows Detective Canterbury's patrol car driving past the

1 Toyota at 4:09 p.m. (*Id.* at 4:09:09.)[4] The car was one of multiple vehicles in an area
2 frequently used for passenger pick-ups and drop-offs.

3 Detective Canterbury testified that the blue Toyota attracted his attention because
4 it seemed to be parked "cattywampus" rather than parallel to the curb. In particular, the
5 car's front right wheel was on top of the curb area. As he passed the blue Toyota,
6 Detective Canterbury saw an individual reclined in the driver's seat who seemed to be
7 watching his patrol car. Detective Canterbury had only a partial view of the individual –
8 later identified as Adreal Wadley—through the closed windows of both his patrol SUV and
9 the sedan. He could see only some of the individual's head and none of his clothing. He
10 observed that the individual was a Black man and that he seemed to have a "flat-top"
11 hairstyle. He also testified that he believed—from his limited view—that the individual in
12 the car was in the "right age range" of the robbery suspect. Detective Canterbury did not
13 see anyone else in the vehicle or note anything else suspicious in the car at this time.

14 While he did not stop as he first drove past the blue Toyota, Detective Canterbury
15 decided to turn his patrol SUV around to observe the car further. At 4:11 p.m.,
16 Surveillance footage shows Detective Canterbury's SUV pulling up and stopping behind
17 the Toyota, approaching from the same direction he approached on his first pass by the
18 car.[5] (Government's Exh. 14 at 4:11:47.)

19 Detective Canterbury testified that sometime between when he first passed by the
20 Toyota and when he finished his loop back, he made the decision to run the Toyota's
21 license plate number through the DMV system. He discovered that the vehicle's

22
23

24 [4]In this order, the Court cites to relevant footage according to the timestamps on
the upper right-hand corners of each recording.

25
26 [5]Detective Canterbury testified that there are several ways a car can turn around
on Victorian Circle Plaza and that he cannot recall the exact route he took. But he
27 acknowledges that he approached the Toyota the second time from the same direction
he approached the first time– suggesting that he may have gone around the block.
28

registration had expired.[6] He stated that he stopped behind the Toyota to "go out on" it— that is, to make contact with the driver—because of the issue with its registration, its illegal parking on the curb, and a potential concern that the man inside was associated with the robbery.

By the time he arrived back at the Toyota, however, its occupant had exited and seemed to have disappeared from the area, leaving the car empty.

Footage from Detective Canterbury's body camera, admitted at the Hearing, begins at 4:11 p.m. on the date of the incident, when Detective Canterbury stopped his patrol car behind the now-empty Toyota. (Government's Exh. 2 at 17:11:11.)[7] This footage shows Detective Canterbury exiting his patrol car, approaching the Toyota, and beginning to look into its windows. (*Id.* at 17:12:30.) Over his radio, Detective Canterbury noted that the "the vehicle [was] now unoccupied" and asked for SPD to "contact Nugget" to see if there was video of the person in the car, to "see if he matches." (*Id.* at 17:12:35-17:13:31.) He walked to the left side of the car to look in the driver-side window, noting over his radio that the vehicle had previously been occupied by one Black male adult and stating, "it looks like there's an AK on the floorboard." (*Id.* at 17:12:35-17:13:31.) For the next several minutes, Detective Canterbury continued to peer in the windows of the Toyota and walk around the area. (*Id.* at 17:13:31-17:15:30.) He also reported the license plate number and the vehicle's location aloud over his radio. (*Id.*)

---

[6]While Detective Canterbury testified that while he could not remember the exact time or location at which he made the decision to run the license plate number through the system, he was aware that the car's registration was expired by the time he stepped out of his patrol SUV.

[7]Detective Canterbury testified that all timestamps on the footage from his body camera (Government's Exh. 2), his front dash camera recording (Government's Exh. 3), and his rear seat camera recording (Government's Exh. 4) are one hour fast. For example, his body camera recording shows an inaccurate starting timestamp of 17:11:11, while the actual time was 16:11:11. For ease of reference, the Court will cite to the timestamps as they appear on the recordings in the government's Exhibits 2, 3, and 4. However, when it describes a time in its factual findings, it will refer to the correct hour.

Detective Canterbury's testimony at the Hearing aligns with his body camera footage. He testified that when he looked inside the Toyota's windows, he saw an AK-style pistol facing upwards, directly beside the driver's seat flush against the floorboard. The gun on the floorboard had a distinctive wood front. He also saw a Glock magazine, marijuana shavings, and a clear, unlabeled container with blue pills he could not identify.

**B.    K-9 Alert**

At 4:15 p.m., a second officer—Detective Radley—arrived at the scene in another marked SPD patrol SUV. (Government's Exh. 14 at 17:15:30.) Before he retired in December 2023 and at the time of Wadley's arrest, Detective Radley was a K-9 officer at SPD. A K-9 dog, Rox, was inside Detective Radley's patrol car when he arrived at the Nugget.[8]

When Detective Radley got out of his SUV, Detective Canterbury told him that a Black man had exited the Toyota and that Detective Canterbury had not seen the man except to identity that he had flat-top-style hair. (*Id.* at 17:15:30-17:16:53.) Detective Canterbury also asked over his radio whether there had been any luck contacting Nugget security. (*Id.* at 17:15:30-17:16:53.) He further explained, "I drove past him, I ran the plate…I flipped around, and by the time I flipped around, he was already out, I didn't even see where he went." (*Id.* at 17:16:57-17:17:04.) And he added, "I don't know if [the car's driver] is your guy or not because he was slouched so far back." (*Id.* at 17:17:30-17:17:50.) Detective Canterbury next checked if the door to the Toyota was locked, commenting that "if it's not [locked] we've got a public safety hazard." (*Id.* at 17:19:24 - 17:18:58.) The car's doors were in fact locked. (*Id.*)

At 4:18 p.m., Detective Radley brought his K-9, Rox, out of his SUV, and the dog began sniffing the Toyota. (*Id.* at 17:18:11-17:20:05.) Rox signaled a positive alert on the

---

[8]Detective Canterbury testified that Detective Radley was called to the scene primarily as general backup, because SPD practice is to respond with two units of officers available in the area. The fact that Detective Radley was a k-9 officer was coincidental.

vehicle. (*Id.*) Detective Canterbury testified that the officers decided to "run the K-9" around the car because they observed pills and a firearm inside, and wanted to see if illegal substances were involved. Detective Canterbuty further testified that he was familiar with the specific K-9 Rox, and familiar "generally" with the things SPD's K-9s are trained to detect.[9] While he did not know exactly what Rox was trained to alert on, he was aware that Rox was trained to detect "illegal substances" and narcotics.

### C.   Nugget Casino Security

Shortly after Rox alerted on the car, Nugget security officer Andrew Trott arrived. (Government's Exh. 2 at 17:21:19-17:23:43.) Detective Canterbury again described the Toyota's driver, this time stating he had an "ice cube" or "Ice T" hairstyle. (*Id.*) When asked whether the individual was associated with the robbery, Detective Canterbury said, "unknown; possibly." (*Id.*) Trott relayed information about the car to surveillance inside the casino over his radio. (*Id.*) And based on information he received back in his earpiece, he told the SPD detectives that the Toyota's driver had been identified inside the Nugget, was wearing all green clothes, and had a bag with him. After hearing this description, Detective Canterbury responded, "ok, so I want to go talk with *that* guy." (*Id.*) Detective Canterbury testified that he did not know exactly how Nugget surveillance identified and

---

[9]During cross-examination, defense counsel asked Detective Canterbury if the K-9 was trained to alert on three specific kinds of drugs. Detective Canterbury responded that he did not know the specifics of the drugs the SPD's K-9s are trained to hit on. He stated that he knew the dogs were trained to detect illegal controlled substances. He later stated that he knew SPD K-9s are not trained to detect marijuana, as he also told Wadley at the time Wadley was apprehended. During Detective Radley's testimony and cross-examination at the Hearing, K9 certification and training records for Rox were admitted, documenting Rox's certifications from 2016, 2017, 2019, 2020, and 2022 (*after* Wadley's arrest in June). (Government's Exh. 9.) The records indicate that Rox received testing as to the detection of methamphetamine, cocaine, and heroin. (*Id.*) SPD's K-9 policy was also admitted. (Defendant's Exh. 510.) The policy standard operating procedures provide that "K-9 teams will train together nine (9) hours a week" and "[a]t least one day a month will be dedicated to narcotic detection . . . ." (*Id.* at 10.) In addition, the policy requires that "[t]he K-9 teams will be tested once a year to the California POST standards." (*Id.* at 11.)

7

tracked Wadley, but that Trott had advised him that Wadley had been "backtracked" from the car into the Nugget.

Detectives Canterbury and Radley discussed whether back-up was available to wait with the car while they tracked its driver, commenting that they did not think any other SPD units were currently available. (*Id.*) On his radio, Detective Canterbury requested a tow of the blue Toyota to the station. (*Id.*)

Trott next told Detectives Canterbury and Radley—again repeating what he heard in his earpiece—that the Toyota's driver had walked past the cage inside the casino and was heading towards the "Victorian doors." (*Id.* at 17:23:43-17:25:49.) Detective Canterbury commented, "I want to get this guy wrapped up if I can" and "he's running around with a gun." (*Id.*)

Detective Canterbury testified that at this time, he wanted to "detain" the Toyota driver because when one gun is identified, he had been trained not to assume that no other guns are involved. The K-9 alert also caused him to believe there were possible drug-related crimes. In addition, Detective Canterbury testified that he found Wadley's movements through the casino suspicious. The Toyota was parked on the east side of the Nugget. Developing information from casino security suggested to him that the driver had walked through the entirety of the Nugget, towards the cage, back in the direction of the Toyota, and then to the *other* side of the Nugget to leave out of the Victorian Avenue northside exit. He believed Wadley was attempting to avoid contact with law enforcement.

Finally, Detective Canterbury believed it was still unknown whether Wadley was related to the robbery and thus that there was a "potential public safety hazard." Detective Canterbury acknowledged, however, that he knew by this time that the hair of the individual in the car did not match the description of the robbery suspect and was aware that the car's driver was wearing all green. On cross-examination, he stated that he based his decision to seize the individual in the car "partially" on the fact that Wadley was a Black man, as well as on his age, the gun, and the possible drugs in the Toyota.

Officers Canterbury and Radley drove to the location where they believed Wadley had exited the casino, per the information they received from Nugget security. (Government's Exh. 2 at 17:25:30-17:25:40.)

### D. Seizure of Wadley

The Court describes the encounter between Wadley and Detectives Canterbury and Radley in segments, followed by timestamps identifying the beginning and end of each segment as captured in the recording from Detective Canterbury's body camera. The entire encounter—from the beginning of the stop to the time when SPD officers reported an official arrest—lasted from 4:26 p.m. to 4:38 p.m., or roughly 12 minutes.

### 1. Initial stop and frisks[10]

At 4:26 p.m., in their SPD vehicles, the officers saw Wadley—who they believed matched Nugget security's description of the Toyota driver—walking on the street.[11] Wadley was wearing an all-green track suit and a green hat, with a purse over his shoulder. He was of small build and had dreadlocks. Upon seeing Wadley, Detective Canterbury activated the overhead red and blue lights on his patrol SUV. He did not activate his siren. He opened his driver's door, pointed his gun, and said loudly, "show me your hands, come here." Detective Radley also had his gun pointed at Wadley. Detective Canterbury asked Wadley to come towards him, and then to stop, turn around, and get down on his knees, put his hands on top of his head, and interlace his fingers. Wadley complied with each of these commands. When Detective Canterbury reached Wadley, he said, "we'll tell you what's going on here in just a second" and handcuffed him. Detective Canterbury then told him, "you're just detained right now, okay? …hold on,

---

[10]The following occurred between 4:26 p.m. and 4:30 p.m. (Government's Exh. 2 at 17:26:43-17:30:15.)

[11]At the Hearing, Detective Canterbury identified the location at which the officers stopped Wadley on the admitted google map overview of the area. (Government's Exh. 1.) The stop occurred north of Victorian Avenue—close to the ATM designated by a gray emblem—and west of the area marked "Nugget Event Center." (Id.)

don't stand up my man, you're just detained." (Government's Exh. 2 at 17:26:43-17:28:15.)

While Wadley was on his knees, Detective Canterbury asked, "are you associated with that vehicle over there?" and Wadley responded, "I'm not, I was just driving it, it's my friend's." Wadley did not ask which vehicle Detective Canterbury meant. Detective Canterbury, who had started to pat down Wadley's pockets, asked if Wadley had "anything on him." Wadley denied having anything other than weed. Detective Canterbury opened Wadley's purse, stating "I'm just making sure, because there's an AK on the floorboard." Wadley again stated that the vehicle belonged to his friend. Both detectives were holding Wadley's arm. (*Id*.)

At the Hearing, Detective Canterbury testified that he considered his seizure of Wadley a "high-risk stop." He stated that SPD officers conduct a high-risk stop involving drawn weapons when they approach anyone who is likely have weapons themselves or has potentially committed a violent crime, or when there is a higher-than-usual safety concern. SPD officers then "gauge compliance." Detective Canterbury testified that he drew his gun for "[his] own safety, [his] partner's safety, and the public's safety" because he was investigating a possible narcotics-related offense in which a gun had already been observed and in which it remained unknown if other guns were involved. Detective Canterbury also testified that he handcuffed Wadley for similar safety reasons and that in such circumstances SPD officers' practice is to initially detain an individual.

The detectives brought Wadley to Detective Canterbury's patrol car. Wadley stated he had been planning to text his friend because the officers had "pulled up and searched his [friend's] car." (Government's Exh. 2 at 17:28:15-17:30:15.)

At the patrol SUV, Detective Canterbury again frisked Wadley, patting down his pockets and reaching in his jacket pocket. Meanwhile, Wadley emphasized that officers would not find anything in the Toyota. Detective Canterbury told Wadley that he had stopped him because of the "AK on the floorboard" and the dog's alert. Detective

Canterbury told Wadley again that he was "just detained" and read him his *Miranda* rights. (*Id.*)

### 2.     Identification[12]

Detective Canterbury asked Wadley for identification and found his ID in a wallet inside the purse, after Wadley consented to its retrieval. Detective Canterbury gave the ID to Detective Radley to run a wants and warrants check. Detective Canterbury asked Wadley if there was "anything he should be concerned about," including any warrants, and Wadley denied having anything to report.[13] (*Id.* at 17:30:15-17:31:35.)

Detective Canterbury asked Wadley additional questions about the car. Wadley again stated that car and gun belonged to his friend. Wadley insisted that the officers had no justification to search his friend's car, to which Detective Canterbury replied, "we do—his dog alerted, that's probable cause to search the car." Detective Canterbury told Wadley that he could assist officers and Wadley interjected, "I can't do it, it's not my car . . . I tried to call him [my friend]." (*Id.* at 17:30:15-17:31:35.)

### 3.     Return to Toyota[14]

Outside his patrol SUV, Detective Canterbury told Wadley "Here's what I'm going to do…because we kind of have only so many officers right now, you're not under arrest you're only detained, I'm going to have you sit in the back of the car right now." Detective

---

[12]The following occurred between 4:30 p.m. and 4:31 p.m. (Government's Exh. 2 at 17:30:15-17:31:35.)

[13]At the Hearing, Detective Canterbury testified that asking for identification is his standard practice as an SPD officer when an individual is detained, and that the purpose of asking for identification is to find out if the individual has any active warrants or a history of violence.

[14]The following occurred between 4:31 p.m. and 4:34 p.m. (Government's Exh. 2 at 17:31:35-17:34:19.)

Canterbury then put Wadley in the back of the patrol vehicle, still in handcuffs.[15] Detective Canterbury also said to Wadley, "The other way you can get out of this car quicker is if you're ok with me driving you back over to where the car is, because I don't want to leave my partner or anybody else over there alone. Is that ok?" Wadley responded in the affirmative. (*Id.* at 17:31:35-17:34:19.)

Around this time, Detective Radley also asked Detective Canterbury if the man they had seized was the person he had seen previously, and Detective Canterbury replied, equivocating, "I will see, his hair . . .".[16] Detective Canterbury also took Wadley's phone, after it seemed that Wadley was attempting to make a call.[17] After seizing the phone and while still in possession of Wadley's purse, Detective Canterbury drove the patrol SUV back to park behind the Toyota. (*Id.*)

### 4.    Discovery of Warrant and Search of Purse[18]

Once his patrol SUV arrived back at the Toyota, Detective Canterbury stopped the vehicle and asked Wadley to stand in front of it. (*Id.* at 17:34:19-17:36:20.)

Detective Canterbury testified that at 4:34 p.m. —within roughly one minute of the return to the Toyota—Officers received communication from SPD dispatch responding to

---

[15]Detective Canterbury testified that he knew by this time that Wadley was not armed and that he put Wadley in the back of the car because he believed that he would have "better control" of Wadley as he continued his investigation without backup.

[16]Detective Canterbury testified at the Hearing that at this time, although he could not be 100% sure that Wadley was the person he saw in the Toyota, he was "pretty confident" that Wadley was the driver because Wadley had already told officers as much.

[17]Detective Canterbury testified that it is not typical to take a detained person's phone initially. But that it is a "case-dependent" practice to take a detained person's phone when they making a phone call, because it is not known who they are calling or if they might be calling someone to ask for assistance or asking someone else to come to the scene.

[18]The following occurred between 4:24 p.m. and 4:36 p.m. (Government's Exh. 2 at 17:34:19-17:36:20.)

Detective Radley's requested wants and warrants check. At this time, dispatch advised that Wadley had an extraditable felony warrant out of Mississippi. The SPD Computer Aided Dispatch ("CAD") log admitted into evidence at the Hearing includes logged entry at 4:34:24 pm. with a comment, "Adreal F-Frank full ex for parole viol out of MS." (Government's Ex. 5 at 4.) At 4:34:27, another log entry, attached to Detective Canterbury's call number, contains the comment, "confirm warrant." (*Id.*)

Detective Canterbury asked how much weed Wadley had in his purse and, when asked if officers could check the amount, Wadley consented to search of the bag. Detective Canterbury opened the purse, pulling out a bag of marijuana before continuing to search in other pockets. He next pulled out an unmarked orange pill bottle, which he opened. Wadley stated that the bottle contained his prescription Xanax and that the prescription itself was at his house. Detective Canterbury continued searching the purse and ultimately pulled out every item inside – which also included receipts and a bottle of liquor. (Government's Exh. 2 at 17:34:19-17:36:20.)

Detective Canterbury next took off Wadley's green hat to look at his hair. The exchange continued and Wadley said that when the patrol car first passed by the Toyota, he had "just pulled up," before going into the casino to put in a bet. He also added that he "called [his friend] to tell him the police had pulled passed his car." (*Id.* at 17:34:19-17:36:20.)

### 5.    Car key search and confirmation of warrant[19]

Detective Canterbury asked if Wadley had the keys to the car. After Wadley equivocated, Detective Canterbury asked, "Do you mind if I check and make sure you don't have the keys on you?" at which point Wadley said that he did have a key in his pocket, but that it was for something else. When Detective Canterbury found a Toyota key, Wadley told him, "you can't search the car." (*Id.* at 17:36:20-17:36:53.)

---

[19]The following occurred at 4:36 p.m. (Government's Exh. 2 at 17:36:20-17:36:53.)

Detective Canterbury told Wadley that the officers were going to search the car because of the K-9 alert, and Wadley stated again that he did not know anything in the car. Detective Canterbury moved Wadley back into the seat of his SUV. He then told Detective Radley, as well as a third officer who had arrived at the scene, that "when he [Wadley] took off his hat . . . it wasn't as flat as I remember it . . .but it's flat here and goes back and he has the dreads . . . that's exactly what I saw when I drove by." (*Id.*)

Detective Canterbury also commented to the other officers at 4:37 p.m., "we've been working on that warrant and criminal history on him." (*Id.*) He testified that he was referring to the previous request to confirm the warrant and that when SPD dispatch gets a warrant, they contact the originating agency to verify that it remains a valid warrant. Detective Canterbury testified that officers do not rely only on the NCIC system when it indicates that a warrant exists, because some warrants on that system might be left in error.

Detective Canterbury further testified that the warrant for Wadley stood out to him because it was for a parole violation. He believed that if a person is on parole, it generally means they have been convicted of a felony-level crime and have been to prison to serve part of their sentence. He felt this was significant because there was a gun in plain view on the floorboard of the car, and that felon in possession of a firearm was a potential crime he was investigating.

Body camera footage shows Detective Radley, listening to his radio, stating at 4:38:03 p.m., "warrant's confirmed, 1095." (Government's Exh. 2 at 17:36:20-17:36:53.) The CAD log entry at 4:38:09 p.m. includes the comment "YR Received—Warrant confirmed."[20] (Government's Exh. 5 at 4.) The CAD log also includes an entry at 4:38:05

---

[20]The warrant for Wadley's arrest, although not viewed by officers at the scene, was valid and admitted into evidence at the Hearing. (Government's Exh. 7.)

p.m. with the code "1095." (*Id*.) Detective Canterbury testified that "1095" is the code SPD uses for an arrest. SPD thus officially recorded an arrest at 4:38 p.m.

### E.    Search and Tow of Blue Toyota

After Wadley was officially placed under arrest, Detective Canterbury used the key he took from Wadley to open the car, and the SPD officers searched the Toyota. (Government's Exh. 2 at 17:38:21.) Detective Canterbury testified that the gun and pills among the items taken from the vehicle were the ones he had seen through the window earlier that afternoon.

The blue Toyota was ultimately towed. Detective Canterbury testified that it was towed because Wadley had been arrested, and because the car had expired registration on a roadway and was parked illegally. Wadley was not the registered owner of the car and Detective Canterbury made no attempts to contact the registered owner. The SPD Vehicle Inventory and Tow Policy effective in 2022 was admitted into evidence at the Hearing. (Government's Exh. 8.)[21]

///

---

[21]Section 7.20.05 of the policy lists the policy for impoundment following arrest: "A. If the driver of a motor vehicle has been arrested, the vehicle shall usually be impounded . . . B. A vehicle inventory search and a 'Vehicle Inventory Report' form shall be completed for vehicles impounded after arrest." (Government's Exh. 8 at 3.) Section 7.20.02 describes inventory searches and states, in part: "A. An inventory search of the contents of all vehicles impounded shall be conducted by the officer or police assistant . . . 1. The inventory shall be conducted prior to releasing the vehicle to the tow truck operator, if feasible . . . 2. The inventory search shall extend to all areas within the vehicle where personal property is ordinarily stored so long as access can be gained without forcible entry and/or, excessive or unnecessary destruction . . . 3. All inventoried items must be recorded on the 'Vehicle Inventory Report' Form . . . ." (*Id.* at 2.) Section 7.20.06 sets out the policy regarding impoundment for parking violations: "A. In cases where vehicles are illegally parked, every reasonable effort shall be made to contact the registered owner and have the vehicle moved. It is within an officer's and police assistants' discretion to issue a citation for a parking violation. Instances when vehicles may be impounded include, but are not limited to: 1. Registration violations . . . 4. Blocking of a street or roadway; or, 5. When the vehicle poses a threat to public health or safety. B. A 'Vehicle Inventory Report' form shall be completed for vehicles impounded for a parking violation." (*Id.* at 4.)

1  **III.    DISCUSSION**

2        The Court first finds, as a threshold matter, that Wadley has standing to challenge

3  the search of the blue Toyota. It then turns to the nature of Wadley's seizure, finding that

4  the detention was an investigatory stop—rather than a *de facto* arrest—and that the

5  investigatory stop was supported by reasonable suspicion. Finally, the Court finds that

6  even if officers lacked reasonable suspicion to stop Wadley, the evidence is nevertheless

7  admissible because the discovery of an outstanding warrant for Wadley's arrest

8  attenuated any violation and because the evidence in the Toyota would have been

9  inevitably discovered.

10       **A.    Standing**

11       As a preliminary issue, the Court addresses the government's argument that

12  Defendant lacks standing to challenge the search of the Toyota because he physically

13  relinquished the car and disclaimed ownership—thereby abandoning it. (ECF No. 48 at

14  7.) The government specifically emphasizes that Wadley was not the car's registered

15  owner, he intentionally separated himself from the car when he saw police driving by, and

16  he further distanced himself when he saw police return to the car. (*Id.* at 8.) The

17  government also points to Wadley's own repeated comments to SPD officers that the car

18  and its contents belonged to his friend. (*Id.* at 8-9.) Defendant counters that neither

19  walking away from a parked vehicle nor merely stating that one does not own an item

20  amounts to abandonment. (ECF No. 50 at 12-13.) The Court agrees with Defendant and

21  finds that he has standing to challenge the search.

22       "[T]he demonstration of a legitimate expectation of privacy 'is a threshold standing

23  requirement, and analysis cannot proceed further without its establishment.'" *United*

24  *States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (quoting *United States v. Cruz–*

25  *Jimenez*, 894 F.2d 1, 5 (1st Cir.1990)). When a person voluntarily abandons property,

26  they lack standing to later challenge its search. *See United States v. Nordling*, 804 F.2d

27  1466, 1469-70 (9th Cir.1986). Abandonment is a "question of intent" in which "[t]he inquiry

28

should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Id* at 1469. Denial of ownership and physical relinquishment are important factors in this abandonment inquiry. *See id.* However, "none of [the Ninth Circuit's] 'abandonment' cases has held that mere disavowal of ownership, without more, constitutes abandonment of a person's reasonable expectation of privacy in that property." *United States v. Lopez-Cruz*, 730 F.3d 803, 809 (9th Cir. 2013). *See also United States v. Baker*, 58 F.4th 1109, 1119 (9th Cir. 2023) ("[A]n individual does not relinquish a possessory interest in an item merely by stating he does not own the item.").

The Court finds that Wadley did not physically relinquish the blue Toyota merely by parking it and leaving it to enter the Nugget, regardless of his subsequent movements within the casino. Ninth Circuit precedent—including the precedent cited by the government—does not support the proposition that a driver who parks their car and leaves it locked, by doing so, indicates their intent to relinquish possession. (ECF No. 50 at 13.) Such a driver generally still plans to reassert physical control over a parked vehicle; Wadley did not leave the Toyota in such a way that it was "virtually certain" to be searched. *See Nordling*, 804 F.2d at 1469-70 (finding that a defendant relinquished a reasonable expectation of privacy in a tote bag left on an aircraft when he repeatedly denied having carry-on baggage and left the bag where anyone could access it, making it "virtually certain that the bag would be opened . . . before he could possibly attempt to reassert physical control").

Moreover, Wadley's comments to Detective Canterbury do not indicate abandonment. Although Wadley stated that the car and its contents belonged to his friend, Wadley did not disavow *connection* to the blue Toyota, in fact readily acknowledging to officers that he was the driver. *See United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992) (finding that a defendant lacked standing because he "disavowed any connection" to a searched vehicle, stating that he knew nothing about it); *Lopez-Cruz*,

730 F.3d at 809 (finding that a defendant did not abandon cell phones, even though he stated they belonged to a friend, because he made no "affirmative denial of any association with the phones"). Wadley also repeatedly stated that he was *himself* opposed to any search of the car. He told Detective Canterbury when he found the key, for example, "you can't search [the car]" (Government's Exh. 2 at 17:36:20-17:36:53), and he told officers he had been on the phone with his friend (*id.* at 17:30:15-17:31:35).

The government seems to imply that Detective Canterbury could have extrapolated, based on what he knew at the time, that Wadley had no privacy interest in the car. (ECF No. 48 at 8-9.) However, Detective Canterbury clearly treated Wadley as if he had a possessory interest in the vehicle throughout the seizure—he asked a series of questions about the contents of the car and pried for permission to search for the key. (Government's Exh. 2 at 17:36:20-17:36:53.) *See Lopez-Cruz*, 730 F.3d at 809 (noting that the fact an agent sought permission before searching a cell phone they knew did not belong to a defendant "suggest[ed] that the agent did not believe that [the defendant] had abandoned his privacy interest in the phone").

In sum, while Wadley exited the blue Toyota and later said it belonged to his friend, he did not abandon the car. He maintained that he was associated with the car and opposed to any search. The Court thus finds that Wadley had a reasonable expectation of privacy in the Toyota and has standing under the Fourth Amendment to challenge its search.

### B.      Nature of the Seizure

Before evaluating the constitutionality of the SPD officers' conduct as a whole, the Court first considers the nature of Wadley's seizure. There is no dispute that Wadley was seized when officers exited their patrol SUVs with guns pointed. (ECF No. 48 at 11-15.) Defendant argues, however, that the interaction amounted to a *de facto* arrest "from the moment Officer Canterbury ordered [Wadley] to stop" —and thus required probable cause to be constitutionally valid. (ECF No. 41 at 8.) The government argues that the detention

was an investigatory stop—requiring a lower threshold of reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968) —and that Wadley was not placed under arrest until after his warrant was discovered and confirmed. (ECF No. 48 at 13-15.)

An investigatory detention is a brief seizure by police based on reasonable suspicion of criminal activity, during which police may stop an individual, question him briefly, and perform a limited frisk for weapons without converting the seizure into an arrest. *See Terry*, 392 U.S. at 22-26. When evaluating whether a seizure constitutes an investigatory stop or a *de facto* arrest, the Court must consider the totality of the circumstances, including "the aggressiveness of the police methods and how much the [individual's] liberty was restricted[,]" and "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). *See also U.S. v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).

In considering the aggressiveness of police action, the Ninth Circuit instructs courts to consider whether the individual was handcuffed, whether the police drew their guns, and the number of officers present. *See Washington*, 98 F.3d at 1188-89. *See also Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1047 (9th Cir. 2014) (noting that the number of police officers present is highly relevant). And in evaluating the degree of restriction on an individual's liberty, the Ninth Circuit has "only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Washington*, 98 F.3d at 1189.

Courts may also "consider the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought as well as the specificity of the information that the persons actually being sought

are likely to forcibly resist police interrogation." *Id.* at 1189-90. "While these considerations are not exhaustive, they all inform the ultimate inquiry of whether the officers' conduct was a reasonable response to legitimate safety concerns on the part of the investigating officers" because "[t]he relevant inquiry is always one of reasonableness under the circumstances." *Id.* at 1185, 1185-90 (quoting *Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir.1995)).

During a *Terry* stop, a police officer may take reasonable measures to mitigate the risk of physical harm and to determine whether the person is armed. *See United States v. Hensley,* 469 U.S. 221, 234-35 (1985); *Terry*, 392 U.S. at 24. *See also United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) ("The use of force . . . does not convert the [investigatory] stop into an arrest if it occurs under circumstances justifying fears for personal safety.").

Here, the Court finds that because circumstances justified concern over safety and over the possibility that Wadley would attempt to leave the scene, tactics used by SPD officers were not so unreasonably aggressive as to convert the seizure from a *Terry* stop to an arrest. Centrally, the Court finds Detective Canterbury's testimony on the "high-risk" nature of the stop credible. The SPD officers knew that there was a firearm in the blue Toyota. While Defendant argues that the officers had no reason to believe that Wadley was armed (ECF No. 50 at 9-10), the officers could have reasonably been concerned that the driver of the car might have another firearm on his person, especially because they knew Wadley had a bag with him (Government's Exh. 2 at 17:21:19-17:23:43). Detective Canterbury testified that, per SPD training, the discovery of one firearm does not alleviate the concern that an individual might have other firearms. Moreover, the officers believed Wadley had previously left through the Nugget through the Victorian Avenue exit in an attempt to avoid contact with law enforcement. (*Id.* at 17:23:43-17:25:49.) *See Washington*, 98 F.3d at 1189 (discussing, as a factor, that restraints that would otherwise

be intrusive may be acceptable when a defendant "takes action at the scene that raises a reasonable possibility of danger or flight").

In this context, the officers were justified in believing that the stop merited extra safety precautions—although only briefly—to gauge Wadley's compliance.[22] As reflected in body camera and audio recordings, the first seconds of the interaction, albeit intense, are largely consistent with this goal. Detective Canterbury testified that both he and Detective Radley drew their guns, that his patrol car lights were flashing, and that he did not activate his siren. Detective Canterbury's first command to Wadley was "show me your hands, come here" before a series of commands directing Wadley to get on his knees and keep his hands accessible. (Government's Exh. 2 at 17:26:43-17:28:15.) The officers' weapons were drawn only during the first few moments of the stop—before Wadley was handcuffed. (*Id*.) When Wadley complied with Detective Canterbury's initial commands, the detectives put away their weapons and moved to less aggressive language. (*Id*.) And after the officers approached Wadley and handcuffed him, they did not take out their guns through the rest of the encounter. *See also United States v. Parr*, 843 F.2d 1228 (9th Cir. 1988) (finding no arrest occurred when a defendant was searched and put in a patrol car); *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982) (finding no arrest occurred when officers handcuffed individuals accused of bank robbery).

The Court notes, here, that at the time of the stop SPD officers were aware that Wadley did not match the description of the robbery suspect. (ECF No. 41 at 9; (Government's Exh. 2 at 17:21:19-17:23:43.) Thus, taken alone, the Court agrees with Defendant that the occurrence of the robbery does not justify an aggressive or highly intrusive stop. But the Court considers the robbery as only one part of the totality of the circumstances analysis—the firearm in the car, combined with the possible narcotics in

---

[22]The analysis of officers' justification for conducting a high-risk stop necessarily overlaps with the discussion of reasonable suspicion that follows in the section below. The Court thus considers facts discussed in each section in tandem.

the car, are separate justifications for caution. Defendant also argues that the officers could not confirm that Wadley was the driver of the vehicle when they seized him. *See Washington*, 98 F.3d at 1189 (directing courts to consider specificity). But Detective Canterbury testified that he knew Nugget security had "backtracked" the driver of the Toyota, and Trott had provided a clear description of his clothing and his expected location. While Detective Canterbury's body camera footage shows him hesitating to unequivocally state that Wadley was the Toyota's driver after he was seized ("Is that the guy you saw?"… "I'll have to see, his hair…" (Government's Exh. 2 at 17:30:15-17:31:35), Detective Canterbury testified at the Hearing that he was "confident" at the time that Wadley was the driver of the car. This confidence was supported by the fact that, after the seizure began, Wadley was immediately aware that the Detectives were referring to the blue Toyota when they began to question him about the car. (*Id.* at 17:26:43-17:28:15.)

The Court further finds that the restrictions imposed on Wadley's liberty were not unreasonably intrusive, either at the beginning of the interaction or as the interaction continued at Detective Radley's patrol car and at the blue Toyota. Once an individual has been frisked and found to be unarmed, police restraint tactics must be calibrated accordingly. *See United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) (finding officers' restraining tactics unreasonable when there was no evidence that the defendant failed to comply or that he was "particularly dangerous, especially once he had stepped out of the van, had been frisked, and was lying on the ground"). While the Court thus recognizes that Detectives' decision not to remove Wadley's handcuffs *after* frisking him rests on weaker justification than their initial decision to handcuff him and frisk him, it ultimately finds that the level of restraint was reasonable. The total time Wadley spent in handcuffs before the discovery of a warrant for his arrest was comparatively short—less than twelve minutes. *Compare Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991) (finding that no arrest occurred during a 30-minute detention). For the majority of

this time, after an initial frisk while he was on his knees, Wadley was standing beside the patrol SUV or in the rear seat of the car. *See id.*; *United States v. Jacobs*, 715 F.2d 1343, 1345-46 (9th Cir. 1983) (defendant ordered to "prone out"). Detective Canterbury testified, consistent with comments audible his body camera recording (Government's Exh. 2 at 17:21:19-17:23:43), that back-up SPD units were unavailable in the area at the time, adding to concerns about officer safety and contributing to his decision to make Wadley sit in the back of his patrol car. Wadley consented to driving with officers to the blue Toyota (*id.* at 17:31:35-17:34:19), and removing the handcuffs immediately prior to the short drive might have further contributed to safety concerns.

Finally, the ultimate inquiry for a Fourth Amendment challenge is whether the officers' conduct was a *reasonable* response to legitimate safety concerns. *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 134 (2014)) ("[W]e have repeatedly affirmed, 'the ultimate touchstone of the Fourth Amendment is reasonableness'"). While some factors support a finding that a *de facto* arrest occurred—Wadley was immediately cooperative with Detectives, he remained handcuffed after officers determined that he was unarmed, and he did not match the description of the robbery suspect to support an intrusive stop under the past-violent-crime factor—the specific circumstances of the case weigh against such a finding. To the extent that Detective Canterbury and Detective Radley's tactics were intrusive, they were *reasonable* under the specific circumstances of this case. The detectives complied with SPD practices for a high-risk stop, which involves drawing guns, as the interaction began. And the continued restraints were also reasonable in a quickly-developing context where Wadley consented to transport and back-up was unavailable. *See Heien*, 574 U.S. at 60-61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's

protection'"); *Allen*, 66 F.3d at 1056 (noting that police officers "need not avail themselves of the least intrusive means of responding to an exigent situation").

The Court thus finds that the seizure fell within the bounds of an investigatory stop as opposed to an arrest requiring probable cause. Accordingly, it turns to the related question of whether SPD officers had reasonable suspicion to detain Wadley.

### C. Reasonable Suspicion for Seizure

Detectives Canterbury and Radley must have had "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot[,]'" *U.S. v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011) (citations omitted), to conduct a constitutional investigatory stop of Wadley under *Terry*. Wadley argues that, even assuming he was not subject to a *de facto* arrest, law enforcement lacked reasonable suspicion to stop him. (ECF No. 41 at 10.) As a result, he argues that fruits of that detention—including statements, substances found on his person, and the car key taken from his pocket— should be suppressed. (*Id.* at 11-12.) The government counters that cumulative facts prior to the seizure were enough to surpass the reasonable suspicion bar. (ECF No. 48 at 10-11.)

"In deciding whether a stop was supported by reasonable suspicion, the Court must consider whether 'in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Basher*, 629 F.3d at 1165 (quoting *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir.2007)). Said otherwise, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981). "The 'reasonable suspicion' necessary to justify such a *Terry* stop depends 'upon both the content of information possessed by police and its degree of reliability.'" *Foster v. City of Indio*, 908 F.3d 1204, 1213-14 (9th Cir. 2018) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). In applying this standard, the Court considers the totality of the circumstances. *See id.* at 1214. And

"Fourth Amendment reasonableness is predominantly an *objective* inquiry." *United States v. Malik*, 963 F.3d 1014, 1015 (9th Cir. 2020), *cert. denied sub nom. Majid v. United States*, 141 S. Ct. 1434, 209 L. Ed. 2d 155 (2021), *and cert. denied*, 141 S. Ct. 1721, 209 L. Ed. 2d 484 (2021) (citation omitted, emphasis in original). An officer may "rely on his training and experience in drawing inferences from the facts he observes," but "those inferences must also be grounded in objective facts and be capable of rational explanation." *U.S. v. Rojas-Millan*, 234 F.3d 464, 469 (9th Cir. 2000).

But "[t]he reasonable-suspicion standard is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). It is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent [wo]men, not legal technicians, act.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996). The reasonable suspicion analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418). While a hunch is not enough, reasonable suspicion is a lower bar than probable cause, and a much lower bar than a preponderance of the evidence. *See id.* at 274.

Here, the Court finds that SPD officers had at least reasonable suspicion to detain Wadley under *Terry*. Wadley argues, centrally, that Detective Canterbury's suspicion was a result of racial profiling based on the purported race of an unrelated robbery suspect. (ECF No. 41 at 11.) Indeed, the Ninth Circuit has for good reason strongly "rejected profiles that are 'likely to sweep many ordinary citizens into a generality of suspicious appearance.'" *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (quoting *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992)). It would be inaccurate, however, to frame the instant case as a one-dimensional reflection of racial profiling. The evidence suggests that SPD officers grew suspicious of Wadley

based on a number of relevant factors appropriate for consideration, which the Court describes in roughly chronological order.

First, the position of the blue Toyota and its driver's behavior were unusual. Detective Canterbury observed the sedan parked illegally, with its wheel on the curb. (Government's Exh. 14.) While the skewed parking was not so far from parallel as to be likely to attract attention by itself, Detective Canterbury observed the driver leaning notably far back in his seat and watching the patrol car drive by slowly. Detective Canterbury learned shortly thereafter that the registration on the vehicle had expired, and thus that it was illegally on the roadway in the first place. By the time Detective Canterbury looped back to the car to observe it further—within only a few minutes—the driver had exited the car and was nowhere in sight. (Government's Exh. 2 at 17:11:11.) Detective Canterbury was reasonable, at least, in wondering whether the driver's abrupt exit after seeing a patrol car indicated their intention to avoid law enforcement officers.

Second, Wadley's odd behavior reasonably drew particular attention in the context of the robbery. This is true even given that the parking violations gave Detective Canterbury reason to seek more information about the car *without* considering the robbery. The RTC Transit Center is located within half a mile of the Nugget, which is a large casino with a high volume of people passing by or through the area surrounding it. (Government's Exh. 1.) The robbery suspect was last seen travelling in the direction of the casino. It was thus not improbable that the suspect would be in the vicinity. At the time Detective Canterbury drove by the Toyota, he testified that he could only see enough of Wadley's head to tell that he was a Black man with a flat-top hairstyle and that he was in the general age-range of the robbery suspect—not particularly old, nor particularly young. These limited physical characteristics were certainly not enough to make a reasonable person believe that Wadley was connected to the robbery, especially because the robbery suspect was specifically described as having a small afro. But Detective Canterbury has never denied that he initially failed to see enough of the driver to make any conclusions.

(Government's Exh. 2 at 17:31:35-17:34:19.) Combined with the expired registration and the crooked parking, he testified that he looped back to the Toyota to make contact with the driver in part to seek further information. He could have reasonably wanted to get a better view of the individual on the public street. And discovering Wadley's abrupt exit increased Detective Canterbury's suspicion, separate and apart from any facts related to physical appearance.

Third, the gun, Glock magazine, and pills in plain view in the Toyota could clearly suggest that the driver was engaged in criminal activity. *See Basher*, 629 F.3d at 1165. Detective Canterbury saw what he believed to be an AK-style weapon on the floorboard of the car in plain view. (Government's Exh. 2 at 17:12:35-17:13:31.) He testified that the weapon was immediately beside the driver seat, where the driver would have easy access. The pills were in an unlabeled container, alongside marijuana shavings. Even assuming that Detective Canterbury did not have reason to believe that the pills were illegal narcotics based on their appearance alone, the haphazard placement of the pill container, in combination with the gun and marijuana shavings and the driver's quick exit after seeing him, suggested that Wadley might have been in the midst of illegal activity, or otherwise trying to hide his participation in past illegal activity. Defendant makes much of the fact that merely possessing a gun and having unidentified pills is not illegal. (ECF No. 50 at 2.) But the Court does not find this argument persuasive; it overlooks the commonsense nature of the reasonable suspicion inquiry. *See Valdes-Vega*, 738 F.3d at 1078 (describing the inquiry as a commonsense one). In a totality analysis, not every element leading to reasonable suspicion of a criminal activity must be criminal by itself.

Fourth, an SPD K-9 alerted on the vehicle. *See, e.g., Illinois v. Caballes*, 543 U.S. 405 (2005) (holding that a dog sniff conducted during a lawful traffic stop, revealing only contraband, does not violate the Fourth Amendment). For the purposes of this order, the Court need not and does not make any finding as to the adequacy of the training and

certification of Rox.[23] The Court only considers the K-9 alert to the limited extent that it goes to the objective perception of the officers at the scene in a reasonable suspicion analysis.[24] In particular, Detective Canterbury testified that, while he did not know exactly which substances SPD K-9's are trained to alert on, he was aware that they are trained to detect illegal narcotics and that they are not trained to detect marijuana. Rox alerted at the passenger-side door of the Toyota. (Government's Exh. 2 at 17:18:11-17:20:05.) Given the items in the car, the alert by a K-9 with which Detective Canterbury was familiar could have reasonably added to the suspicion that the pills already in plain view were, in fact, illegal.

Fifth, Detectives Canterbury and Radley reasonably believed that Wadley's movements within the casino were unusual enough to suggest that he was further attempting to avoid contact with police. Nugget security officer Trott informed the SPD officers that Wadley was being tracked inside the casino and that he walked past the cage and towards the "Victorian doors" at the north side of the casino. (*Id.* at 17:23:43-17:25:49.) This suggested to the officers that Wadley walked back in the direction of the car, saw the officers at the Toyota, and then decided to leave through an entirely different part of the casino.

---

[23]In general, a positive alert by a *well-trained* narcotic detection dog creates probable cause to search a vehicle. *See Florida v. Harris*, 568 U.S. 237, 248 (2013). Here, because the Hearing made clear that there are remaining genuine factual disputes about the adequacy of Rox's training, the Court does not base its ruling on a finding that there was probable cause to search the Toyota as a result of the K-9 alert alone. Instead, it applies a "flexible, common-sense standard" to consider the alert as one factor leading to officers' decision to detain Wadley. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (describing the flexibility of probable cause standards).

[24]The parties largely did not brief the issue of the impact of the dog sniff on reasonable suspicion if Rox was *not* "well-trained" but officers *believed* that she was. Here, the Court notes only briefly that it does not evaluate probable cause or reasonable suspicion in hindsight. *See Harris*, 568 U.S. at 249. *See also, e.g., Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011) ("Even if an officer makes a mistake of fact, that mistake will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot.").

Again, the Court notes that by the time Trott was describing Wadley's movements he also had communicated to the SPD officers that the driver of the car had been identified in all-green clothes. (*Id.* at 17:21:19-17:23:43.) This meant that the officers became aware that Wadley did not match the description of the robbery suspect. Audio suggests that Detective Canterbury began to operate on the belief that the Toyota driver was *not* related to the robbery. After hearing Trott's description, for example, he commented "ok, so I want to go talk to *that* guy." (*Id.*) But again, by this time there were enough facts to support independent reasonable suspicion that the driver of the Toyota was engaging in criminal activity, separate from the robbery.[25]

For all of these reasons, the Court finds that Detectives Canterbury and Radley had reasonable, particularized suspicion to initiate the *Terry* stop.

### D.    Discovery of Warrant and Probable Cause

Given that SPD officers had reasonable suspicion to constitutionally stop Wadley, the most important subsequent development was the discovery of the warrant for Wadley's arrest during that stop. Officers took Wadley's ID information at the beginning of the seizure, which Detective Canterbury testified is consistent with basic SPD protocol. (*Id.* at 17:30:15-17:31:35.) At 4:34 p.m., immediately after the officers returned to the Toyota with Wadley, they received communication from dispatch advising of Wadley's extraditable felony warrant out of Mississippi. (Government's Ex. 5 at 4.) At 4:38 p.m.—four minutes later—the warrant was confirmed. (*Id.*)

The warrant is relevant both to Wadley's official arrest and to the car search. First, as to the arrest, the warrant—combined with the gun in view—created independent

---

[25]Defendant argues that Detective Canterbury lacked reasonable suspicion to identify him as the driver of the car, because he later admitted at the scene of the detention that he did not know if Wadley was the individual he saw in the driver's seat. (ECF No. 41 at 11.) But the Court credits Detective Canterbury's testimony that when he made those comments, he was confident that he was the driver and that Nugget security had effectively backtracked him.

probable cause to believe that Wadley was committing a crime: namely, the possession of a firearm as a felon. The Court credits Detective Canterbury's testimony that the warrant stood out to him specifically because it was for a parole violation, and he was aware that a parole violation generally follows a felony conviction. Because there was a gun in plain view in the car, he began to consider felon in possession of a firearm as a standalone crime under investigation. In addition, a warrant itself is a "judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *Utah v. Strieff*, 579 U.S. 232, 240 (2016) (quoting *United States v. Leon*, 468 U.S. 897, 920 n. 21 (1984)). SPD officers thus had an independent duty to investigate Wadley's warrant. Accordingly, there was probable cause to arrest Wadley based on both the warrant itself and the presence of the firearm, apart from any search of the vehicle.

Second, as to the car search, the discovery of the arrest warrant made the firearm inside—which otherwise could have plausibly been legal—clear evidence of a crime. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (noting that probable cause to search exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place"). The automobile exception to the warrant requirement generally allows police to search a car without a warrant when there is probable cause, given exigency arising from the prospect that evidence or contraband may be removed from the scene due to the vehicle's mobility. *See, e.g.*, *California v. Acevedo*, 500 U.S. 565, 569 (1991); *Carroll v. United States*, 267 U.S. 132, 151 (1925).

Defendant argues that officers illegally frisked him during his seizure, and that the car key—and the evidence found in the car—must be suppressed as a result of these warrantless searches.[26] (ECF No. 41 at 14.) But the circumstances of the frisk and the

---

[26]The reasonableness of a stop and a frisk under *Terry* must be analyzed separately; the elements of each must be considered independently. *See United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).

items retrieved are largely irrelevant. Ultimately, the car search was *not dependent* on the car key. Because Wadley was not the registered owner of the car, and he had been on the phone with a friend who ostensibly owned it, officers could have reasonably been especially concerned that the Toyota might be moved. *See Carroll*, 267 U.S. at 151. Accordingly, because the automobile exception applied, officers could have searched the car without relying on the fruits of any frisk—whether or not that frisk exceeded the scope of *Terry*. And the Court has already set aside, to Wadley's benefit, the possibility that the K-9 alert had provided earlier, independent probable cause to search the Toyota before he was seized. So in sum, the Court finds that the search of the Toyota was also constitutional.

### E.   Attenuation and Inevitable Discovery

Even if the Court were to find that officers lacked reasonable suspicion to seize Wadley, the attenuation and inevitable discovery doctrines apply to make the evidence in question admissible.

The government argues, and the Court agrees, that Defendant's warrant broke the causal chain between any arguably unlawful stop and the discovery of incriminating evidence. (ECF No. 48 at 17.) Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 579 U.S. at 238 (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006). Courts consider three factors: "(1) the 'temporal proximity' between the unconstitutional conduct and the discovery of [the] evidence"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 239-41.

The government concedes that the first *Strieff* factor, temporal proximity, weighs against a finding of attenuation because the evidence was obtained in close proximity to

Wadley's detention. (ECF No. 48 at 17.) However, the discovery of the outstanding arrest warrant weights the second factor, the presence of intervening circumstances, in the government's favor. *See Strieff*, 279 U.S. at 239-40 (finding that an outstanding warrant was a sufficient intervening event to break the causal chain originating with unconstitutional conduct, because "the warrant was valid, it predated [the] investigation, and it was entirely unconnected with the stop"). In *Strieff*, the Supreme Court emphasized that upon discovery of the warrant, the officers had an *obligation* to arrest. *See id.* at 240. As in *Strieff*, the Mississippi warrant this case was valid, as officers took steps to confirm at the scene, it predated the investigation, and it was unconnected to the stop. The Court is not persuaded by Defendant's argument that the attenuation doctrine does not apply to the search which occurred here because that search was not the direct result of Wadley's arrest. (ECF No. 50 at 4-6.) It is true, as Defendant notes in his reply, that the attenuation cases cited by the government largely address circumstances under which the relevant search was conducted *incident* to an arrest, rather than separately from the arrest. (*Id.*) *See, e.g., Strieff*, 279 U.S. at 240-42; *United States v. Chew*, 802 F. App'x 313, 314 (9th Cir. 2020). But this does not mean, as Defendant suggests, that "nothing about the existence of an arrest warrant authorized officers to search the vehicle." (ECF No. 50 at 5.) Here, as the Court has already discussed, the discovery of the valid warrant meant that items in plain view in the car became themselves evidence of a new crime. The search of the car was not the result of separate unconstitutional conduct, but rather part of the chain of events reasonably initiated on its own accord by the valid arrest warrant.

The third factor, the purpose and flagrancy of official misconduct, also weighs in favor of the government. *See Strieff*, 279 U.S. at 239 (describing this factor as particularly significant). As the Court has already discussed, factors impacting Detectives Canterbury and Wadley's decisions during the seizure included (1) the absence of other backup SPD units; (2) initial concern that Wadley might be armed; and (3) Wadley's consent to

transport back to the Toyota, consent to the search of his bag, and consent to the search of his person for the car key. Given these facts, even assuming an alternative finding that Officers' use of force, frisks, and liberty restrictions crossed the line into unreasonableness, that conduct does not reflect a *flagrant* or *purposeful* violation. *See Strieff*, 279 U.S. at 242 (finding that there was no flagrant violation because there was no indication of systemic or recurrent police misconduct).

Finally, the Court finds that rationale of the inevitable discovery doctrine bolsters the government's positions on the Mississippi warrant and attenuation. The inevitable discovery doctrine, which supports the broader deterrence purpose of the exclusionary rule, allows for admission of evidence when the police "would have obtained that evidence if no misconduct had taken place." *Nix v. Williams*, 467 U.S. 431, 444 (1984). The exception is intended to ensure that the government is not put in a worse position than it would have been absent any violation. *See id.* at 443-44. Here, the blue Toyota was parked illegally and had expired registration. At the very least after his arrest for an outstanding warrant, SPD would have towed the Toyota and conducted an inventory search. Such a search would have occurred regardless of whether there was probable cause to search the car at the scene. According to the SPD Vehicle inventory and tow policy, "if the driver of a motor vehicle has been arrested, the vehicle shall usually be impounded" and an inventory report form completed.[27] (Government's Exh. 8 at 3.) In sum, the Court finds that the valid warrant for Wadley's arrest changed the nature of the investigation, even if violations occurred.

---

[27]Moreover, the Toyota could likely have been towed and inventoried before Wadley was even identified or seized because SPD officers have discretion to impound vehicles for registration violations or when a vehicle poses a threat to public health or safety, and an inventory form must also be completed in these circumstances. (*Id*. at 4). However, given that the car was not registered in his name, it is not as clear that the items inside would have inevitably been connected to Wadley if officers never made contact with him. Because of this uncertainty, the Court does not rely on or base its findings on this narrower application of the inevitable discovery doctrine.

1

## IV.      CONCLUSION

2          The Court notes that the parties made several arguments and cited to several

3  cases not discussed above. The Court has reviewed these arguments and cases and

4  determines that they do not warrant discussion as they do not affect the outcome of the

5  issues before the Court.

6          It is therefore ordered that Wadley's motion to suppress (ECF No. 41) is denied.

7          DATED THIS 5th Day of June 2024.

8

9          _____

10          MIRANDA M. DU
          CHIEF UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28